UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GORSS MOTELS INC.<br>*Plaintiff*,<br><br>v.<br><br>A.V.M. ENTERPRISES, INC., *et al.*<br>*Defendants*. | )  3:17-CV-01078 (KAD)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  MARCH 26, 2021<br>) |

<u>**MEMORANDUM OF DECISION**</u>
**RE: CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF NOS. 90 & 92)**

Kari A. Dooley, United States District Judge:

Plaintiff Gorss Motels Inc. ("GMI") brings this case under the Telephone Consumer Protection Act of 1991 ("TCPA"), as amended by the Junk Fax Prevention Act of 2005 ("JFPA"). 47 U.S.C. § 227. GMI alleges that Defendant A.V.M. Enterprises, Inc. ("A.V.M.") sent six unsolicited facsimile advertisements to GMI in violation of the TCPA. The Court previously denied GMI's motion for class certification. Pending before the Court are the parties' cross motions for summary judgment.

For the reasons set forth in this decision, A.V.M.'s motion is GRANTED and GMI's motion is DENIED.

**FACTUAL BACKGROUND & PROCEDURAL HISTORY**

GMI is the former corporate owner of a Super 8-branded motel and a franchisee of Wyndham Hotel Group ("Wyndham"). Steven Gorss is the former president of the company. To become, and then maintain status as, a Super 8-branded motel, GMI entered into a series of franchise agreements. After first becoming a Super-8 franchisee in 1988, GMI signed an extension to the company's original franchise agreement in 2009 and a renewed franchise agreement in 2014. Before entering into the 2014 Franchise Agreement with Wyndham, GMI was required to

complete and sign a Franchise Application Form, which included the company's contact information and fax number, and to sign off on Franchise Disclosure Documents, which included information about franchise standards and the mechanism by which GMI could purchase certain goods.

The 2014 Franchise Agreement also included a Property Improvement Plan, or "PIP," that mandated certain updates to GMI's franchise. Specifically, the PIP required GMI to, among other things, make updates to the hotel's breakfast area, bed sets, draperies, and case goods. The PIP also stated that Wyndham would provide its vendors with GMI's contact information.

A.V.M. is a Wyndham-approved supplier of "soft" goods, which includes items such as bedding, drapes, personal paper products, small fixtures, small appliances, case goods, and other supplies. A.V.M. became part of Wyndham's supply chain as an approved supplier in 2009, after signing an agreement with Wyndham-affiliate Worldwide Sourcing Solutions, Inc. ("WSSI"). WSSI is the entity through which Wyndham operates the approved supplier program.[1] With certain exceptions, Wyndham did not require its franchisees to purchase their operational materials through approved suppliers, and A.V.M. was not an exclusive supplier. A handful of suppliers provided the same types of product as A.V.M.

Nevertheless, Wyndham negotiated with suppliers, including A.V.M., to support the purchasing efforts of Wyndham franchisees, and Wyndham collected a commission for sales made by approved suppliers through Wyndham's systems. Wyndham also worked with A.V.M. and its other approved suppliers to create advertisements for broadcasting to Wyndham franchisees via fax. Wyndham arranged to send the fax advertisements through a third-party company using a

---

[1] In their cross motions, the parties do not distinguish between Worldwide Sourcing Solutions, Inc. and Wyndham. They are therefore treated as a single entity in this decision.

recipient list generated and provided by Wyndham. A.V.M. does not have GMI's fax number in A.V.M.'s system.

Between June 15, 2015, and May 16, 2016, GMI received six faxes advertising A.V.M.'s products. All six of these advertisements include descriptions and prices for goods implicated by the PIP. Five of these six faxes contain a reference to Wyndham.

GMI sold its interest in the Super-8 franchise location at issue on May 24, 2016, and GMI, as an incorporated entity, brought its lawsuit against A.V.M. as a class action on June 29, 2017. After a hearing, the Court (Bolden, J.) denied A.V.M.'s motion to dismiss on February 2, 2018.[2] The Court denied GMI's motion for class certification on September 10, 2019.

**STANDARD OF REVIEW**

The standard under which courts review motions for summary judgment is well-established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," while a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Significantly, the inquiry being conducted by the court when reviewing a motion for summary judgment focuses on "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id*. at 250. As a result, the moving party satisfies his burden under Rule 56 "by showing . . . that there is an absence of evidence to support

---

[2] This matter was transferred to the undersigned on October 17, 2018.

3

the nonmoving party's case" at trial. *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks omitted).

Once the movant meets his burden, the nonmoving party "must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "[T]he party opposing summary judgment may not merely rest on the allegations or denials of his pleading" to establish the existence of a disputed fact. *Wright*, 554 F.3d at 266; *accord Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990). Bald assertions that are unsupported by evidence will not be enough to avoid entry of summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). "In deciding a motion for summary judgment, the district court's function is not to weigh the evidence or resolve issues of fact; it is confined to deciding whether a rational juror could find in favor of the non-moving party." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002).

**DISCUSSION**

In its motion for summary judgment, GMI argues that A.V.M. violated the TCPA by sending six unsolicited fax advertisements. A.V.M., in its own motion for summary judgment, argues that the faxes in question were not unsolicited because GMI gave prior express invitation or permission for approved suppliers, including A.V.M., to send fax advertisements. A.V.M. also argues that GMI should be collaterally estopped from litigating the question of whether it

consented to receive fax advertisements under the 2014 Franchise Agreement and the 2014 Property Improvement Plan.

*The History of "Unsolicited Advertisements" under the TCPA*

Citing the need to facilitate interstate commerce, Congress passed the TCPA to protect the privacy interests of residential telephone subscribers and to facilitate interstate commerce by restricting certain uses of facsimile (fax) machines and automatic dialers. S. Rep. No. 102-78, at 1 (1991). "Junk fax" advertising was considered especially pernicious because it "shift[ed] some of the costs of advertising from the sender to the recipient" and "occupi[ed] the recipient's facsimile machine so that it [was] unavailable for legitimate business messages while processing and printing the junk fax." H.R. Rep. No. 102-317, at 10 (1991). The TCPA officially became law on December 20, 1991, and the Act made it illegal, among other things, "to use any telephone facsimile machine, computer, or other device to send an **unsolicited advertisement** to a telephone facsimile machine." Pub. L. 102-243, § 3(a), 105 Stat. 2394, 2396 (1991) (emphasis added). Liability under the new law would therefore be determined, in part, by what constituted an unsolicited advertisement, and the definition of "unsolicited advertisement" subsequently propelled a back-and-forth between Congress and the Federal Communications Commission ("FCC") that extended for over a decade.

At the time it passed the TCPA, Congress defined "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express permission or invitation." Pub. L. 102-243, § 3(a), 105 Stat. 2394, 2395 (1991). Congress also provided rulemaking authority to the FCC in the TCPA, and the FCC quickly exercised that authority to, among other things, create the "established business relationship" exception to the prohibition on unsolicited

advertisements. *See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 FCC Rcd. 8751, 8779, ¶ 54 n.87 (October 16, 1992) (hereinafter the "1992 FCC Order"). The established business relationship exception considered fax advertisers who had a previous commercial connection with the recipient to have that recipient's prior express invitation or permission to receive fax advertisements. *Id.* As envisioned by the FCC in 1992, the exception sprung from the idea that a consumer with a prior relationship with a sender would be less bothered by advertising because "facsimile transmission from persons or entities who have an established business relationship with the recipient can be deemed to be **invited or permitted** by the recipient." *Id.* (citing 8770, ¶ 34 of the same) (emphasis added). The business relationship exception was "broad enough to encompass a wide range of business relationships," possibly "extend[ing] to the [sender's] affiliates and subsidiaries." *Id.* at 8770, ¶ 34.

But whether because of changes in technology or because the established business relationship exception "amounted to an effective exemption from the prohibition on sending unsolicited facsimile advertisements," the FCC was ready to revisit the exception in 2002. *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 17 FCC Rcd. 17459, 17465, 17483 (Sept. 18, 2002). And on July 3, 2003, the FCC reversed course and eliminated the business relationship exception to the statutory requirement of prior express permission or invitation. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, 14124–30 (July 3, 2003) (hereinafter the "2003 FCC Order"). Citing the cost burdens placed on fax recipients and the TCPA's legislative history, the FCC stated that prior express permission or invitation to send unsolicited advertisements must be "in writing and include the recipient's signature" and that the established business relationship would "no longer be sufficient to show that an individual or business [had] given their express

6

permission to receive unsolicited facsimile advertisements." *Id.* at 14126–28. Further, the recipient would be required to "clearly indicate that he or she consents to receiving such faxed advertisements from the company to which permission is given, and provide the individual or business's fax number to which faxes may be sent." *Id.* at 14126.

The rules implementing these changes were to become effective on August 25, 2003. *Rules and Regulations Implementing the Telephone Consumer Protection Act (TCPA) of 1991*, 68 Fed. Reg. 44144, 44176 (July 25, 2003). But following a number of petitions for reconsideration and before the updated rules took effect, the FCC stayed the rules concerning both the in-writing requirements and those related to the established business relationship exception on August 18, 2003. S Rep. No. 109-76, at 4–6 (2005); *see also In re Rules & Regulations Implementing the Telephone Consumer Protection Act (TCPA) of 1991*, 21 FCC Rcd. 3787, 3789–91, 3790 n.22, 3791 n.31 (Apr. 6, 2006) (hereinafter the "2006 FCC Order") (setting out the FCC's actions in greater detail); *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 20 FCC Rcd. 19758, 19772 (Dec. 9, 2005) (extending the relevant stays until the conclusion of rulemaking under the Junk Fax Protection Act of 2005).

Indeed, Congress was again legislating in this area, and, in response to the 2003 FCC Order, Congress enacted the Junk Fax Prevention Act of 2005, Pub. L. 109-21, 119 Stat. 359. *See* S. Rep. No. 109-76, at 6–7 (2005) ("This legislation is designed to permit legitimate businesses to do business with their established customers and other persons with whom they have an established relationship without the burden of collecting prior written permission to send these recipients commercial faxes."). The Act, or the "JFPA," ensured that the established business relationship exception would survive any further intervention from the FCC by writing the exception into law. *See* Pub. L. 109-21, § 2, 119 Stat. 359, 359 (amending 47 U.S.C. § 227(b)(1)(C) to prohibit

7

unsolicited advertisements unless "the unsolicited advertisement is from a sender with an established business relationship with the recipient").

Congress also negated the portion of the 2003 FCC Order stating that prior express invitation or permission had to be "obtained in writing, include the recipient's signature, contain a clear indication that he or she consents to receiving such faxed advertisements, and provide the fax number to which faxes are permitted to be sent." *See* S. Rep. No. 109-76, at 3 (2005) (citing the 2003 FCC Order). Congress did so by modifying the definition of "unsolicited advertisement" and adding "in writing **or otherwise**" to the end of the definition of unsolicited advertisement. JFPA, Pub. L. 109-21, § 2, 119 Stat. 359, 362 (emphasis added). This change was designed to statutorily prohibit the FCC from promulgating a rule that would require prior express permission to be obtained only in writing. S. Rep. No. 109-76, at 11–12 (2005). The definition has not been amended since, *see* 47 U.S.C. § 227(a)(5), and the FCC subsequently amended its own regulations to align with the language adopted by Congress. *2006 FCC Order*, 21 F.C.C. Rcd. at 3810–11; 47 C.F.R. § 64.1200(f)(15).

The statute, as result, defines an "unsolicited advertisement" as:

> . . . any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's **prior express invitation or permission**, in writing or otherwise.

47 U.S.C. § 227(a)(5) (emphasis added).

***"Prior Express Invitation or Permission" in the TCPA***

As earlier indicated, the parties disagree as to whether the six faxes were sent without "prior express invitation or permission" as required under 47 U.S.C. § 227(a)(5). In the first instance, the

8

parties disagree as to what "prior express invitation or permission" means.[3] A.V.M. argues that, because prior express invitation or permission has the same meaning as prior express consent, a phrase also used in the TCPA,[4] the faxes at issue were not unsolicited. Specifically, A.V.M. argues that GMI provided its express prior consent to send the faxes when it signed the 2014 Franchise Agreement and the Property Improvement Plan, which required that GMI make certain improvements to its hotel. The argument goes that by providing its fax number while both agreeing to make improvements to the hotel and acknowledging that Wyndham would provide assistance in making those improvements, GMI consented to receiving fax advertisements from the list of approved suppliers. GMI, for its part, denies that it consented to receive the faxes by virtue of these agreements and argues in the alternative that consent is not the same as "prior express invitation or permission," as contemplated under the TCPA. GMI argues that prior express invitation or permission is a more stringent standard than prior express consent, so even if GMI provided consent, it did not provide prior express permission or invitation.[5]

The Second Circuit has not spoken on what constitutes "prior express permission or invitation" in the fax advertising context, to include whether prior express invitation or permission has the same meaning as prior express consent. In the absence of controlling precedent, the Court undertakes the familiar inquiry of statutory interpretation. The Court looks first to the text of the statute, and if the plain meaning of the text is clear, then the Court's inquiry will generally end

---

[3] The Court declined to take up this question when rendering its decision on class certification. *Gorss Motels Inc. v. A.V.M. Enterprises, Inc.*, 3:17-cv-01078 (KAD), 2019 WL 4278951, *3 n.2 (D. Conn. Sept. 10, 2019).

[4] 47 U.S.C. §227(b)(1)(A) provides that "it shall be unlawful for any person within the United States or any person outside the United States if the recipient is within the United States … to make any call (other than a call made for emergency purposes or made with the **prior express consent of the called party**) using any automatic telephone dialing system or prerecorded voice . . . ." (Emphasis added.)

[5] The parties agree, however, that whether GMI provided prior express permission or invitation to send fax advertisements is an affirmative defense on which A.V.M. bears the burden of proof. *See* 47 U.S.C. §§ 227(a)(5), 227(b)(1)(C); *see also Latner v. Mount Sinai Health Systems, Inc.*, 879 F.3d 52, 54 (2d Cir. 2018) (stating that prior express consent is a defense under the TCPA).

there. *United States v. Balde*, 943 F.3d 73, 81 (2d Cir. 2019) (quotation and citation omitted). In analyzing the statutory text, the Court considers the ordinary or natural meaning of the words chosen by Congress as well as the placement and purpose of the words in the statutory scheme. *Id.* By looking to the context of the statute's words, the Court ensures that it has not overlooked a congressional attempt to depart "from the natural and popular acceptation of language." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 228 (2014) (quoting *Greenleaf v. Goodrich*, 101 U.S. 278, 284–85 (1880)).

The TCPA, as amended by the JFPA, does not define prior express invitation or permission, or, for that matter, prior express consent. Looking to the ordinary meaning of the words used, "prior," when used an adjective as it is in § 227(a)(5), means "earlier in time or order." PRIOR, Merriam-Webster's Unabridged Dictionary (2021) (online ed.). *Black's Law Dictionary* defines "permission" as "the official act of allowing someone to do something" and "express permission" as "[p]ermission that is clearly and unmistakably granted by actions or words, oral or written." PERMISSION, Black's Law Dictionary (11th ed. 2019). *Black's* limits its definition of "invitation" to the tort context, but *Webster's* defines "invitation" as "a written or verbal request to do or undertake." INVITATION, Merriam-Webster's Unabridged Dictionary (2021) (online ed.).

"Consent," meanwhile, is defined as "[a] voluntary yielding to what another person proposes or desires; agreement, approval or permission regarding some act or purpose." CONSENT, Black's Law Dictionary (11th ed. 2019). The plain, definitional meanings of both permission and consent are similar—both convey that one person must affirmatively indicate that another person may take an action before that other person takes that action. In ordinary use, "prior express permission" and "prior express consent" therefore appear to carry the same meaning. *See*

10

*Physicians Healthsource, Inc. v. Cephalon*, 954 F.3d 615, 621 (3d Cir. 2020) (reaching the same conclusion); *see also Gorss Motels, Inc. v Safemark Systems, LP*, 931 F.3d 1094, 1100 (11th Cir. 2019) (providing a textual analysis of "prior express invitation or permission"). And as did the Third Circuit, this Court observes that the definition of "consent" contains the word "permission," which reveals that these concepts are closely related. *Cephalon*, 954 F.3d at 621.

Further, the terms' appearance within the statutory and regulatory scheme confirms that prior express permission and prior express consent have essentially the same meaning. The Third Circuit lays out numerous examples in which "prior express permission or invitation" and "prior express consent" are used interchangeably in the phone number and fax number context within the TCPA. *Id.* at 621–22. This Court finds those examples persuasive and offers another: In the 2006 FCC Order, the FCC used the term "prior express permission" when describing the FCC's telemarketing and CAN-SPAM rules for wireless devices, but by statute, such telemarketing restrictions refer to "prior express consent." *Compare* 47 U.S.C. § 227(b)(1)(A), *with 2006 FCC Order*, 21 FCC Rcd. at 3812 n.175.

Both because the ordinary meaning of "prior express permission" and "prior express consent" are essentially the same and because the statutory and regulatory regimes use these terms interchangeably, the Court finds that these two terms carry an equivalent meaning under the TCPA.[6] Having so found, the Court looks to Second Circuit precedent to determine the scope and meaning of prior express consent.

---

[6] Additionally, the Court highlights that 47 U.S.C. § 227(a)(5) mentions "prior express invitation **or** permission." (emphasis added). Either invitation or permission is therefore sufficient to make an advertisement not unsolicited, *see id.*, and because the parties have not drawn a distinction between invitation and permission, the Court declines to consider the meaning of prior express invitation other than to note that the definition of invitation, as given above, does not preclude permission from having the same definition as consent.

11

A party has given its prior express consent to receive an advertisement when the party receives an advertisement that is related to the reason why the party provided its contact number to the sender. *Latner v. Mount Sinai Health Systems, Inc.*, 879 F.3d 52, 55 (2d Cir. 2018). In *Latner*, the plaintiff went to a health facility for a routine health examination, and he filled out several new patient forms as part of the intake process. *Id.* at 53. One of those forms included his contact information, and a second form granted the health facility the right to use his health information "for payment, treatment and hospital operations purposes." *Id.* The health facility subsequently hired a third party to send mass messages on behalf of the facility, and one of those messages included a flu shot reminder which was sent to the plaintiff. *Id.* at 53–54. The plaintiff then sued the health facility and an affiliate for violating the TCPA by sending him the text message via an automated telephone dialing system without his consent. *Id.* at 54. On appeal, the Second Circuit found that, because the flu shot text could have been considered treatment information and that privacy notices on the plaintiff's intake forms indicated that he might be sent information "to recommend possible treatment alternatives or health-related benefits and services," the text messages were related to the reason that he provided the number. *Id.* at 55. Therefore, the individual had given his prior express consent to receive the text message. *Id.*

The Court observes that this standard is congruent with the TCPA's statutory history with respect to fax advertisements. As discussed above, the term "express permission" means "[p]ermission that is clearly and unmistakably granted by **actions or words, oral or written**." PERMISSION, Black's Law Dictionary (11th ed. 2019) (emphasis added). By adding "in writing or otherwise" to the definition of unsolicited advertisement in the JFPA, Congress effectively undermined the more stringent requirements contained in the 2003 FCC Order. Indeed, the phrase "or otherwise" is a recognition that permission might be given by multiple different means or

mechanisms, and Congress appears to have made no effort to cabin the circumstances under which permission might be found.

The Court also observes that, to the extent that any deference or persuasive effect is still owed to the 2003 FCC Order,[7] the holding of *Latner* is not incongruous with the FCC's comment therein that "[e]xpress permission to receive a fax ad requires that the consumer understand that by providing a fax number, he or she is agreeing to receive a fax advertisement." *2003 FCC Order*, 18 F.C.C. Rcd. at 14129. This comment appears in the context of a discussion as to whether the provision of a fax number to a trade association that later publishes the number in a directory constitutes prior express permission to receive fax advertisements, *id.*, a situation not implicated here. As the FCC observed, consumers provide their fax numbers to trade associations for a multitude of purposes, and so, in the trade association and directory contexts, whether a consumer had consented to receive advertising by providing a number was unclear. *Id.* In this same section the FCC also observed that "it was appropriate to treat the issue of consent in any complaint regarding unsolicited facsimile advertisements on a case-by-case basis." *Id.* And where a party voluntarily provides a fax number to an entity for the purpose of being contacted about product information, the party understands that it is agreeing to receive fax advertisements. *See Cephalon*, 954 F.3d at 620 and 620 n.6. The holding in *Latner*, which asks whether the unsolicited advertisement is related to the purpose for which the number was given, therefore fits squarely within any relevant guidance from the FCC.[8]

---

[7] Despite the series of stays and subsequent rulemaking following passage of the JFPA, the FCC never specifically rescinded the 2003 FCC Order, and other courts have consistently cited this consumer understanding requirement in deciding the issue of prior express permission or invitation. *See, e.g.*, *Physicians Healthsource, Inc. v. A-S Medication Solutions, LLC*, 950 F.3d 959, 965 (7th Cir. 2020) (citing *2003 FCC Order*, 18 F.C.C. Rcd. at 14129).

[8] The Court is aware that other courts, citing the 2003 FCC Order, have found that a defendant must essentially "point to some document in which [an advertising recipient] agreed to receive fax advertisements or was put on notice that by furnishing its fax number it was agreeing to receive fax advertisements" to prove that the defendant had prior express permission. *See, e.g.*, *Sprint Communications Company, L.P.*, No. 3:17-cv-546 (JAM), 2020 WL 818970, at *2 (D. Conn. Feb. 19, 2020); *A-S Medication Solutions*, 950 F.3d at 966. As discussed above, because Congress

To recap, "prior express permission" has the same meaning as "prior express consent" under the TCPA, and a consumer has given its prior express consent to receive a fax advertisement when that consumer receives an advertisement that is related to the reason the party provided its contact number. *See Latner*, 879 F.3d at 55; *accord Cephalon, Inc.*, 954 F.3d at 619 ("The voluntary provision of a number—phone or fax—by a message-recipient to a message-sender, constitutes express consent such that a received message is *solicited* and thus not prohibited by the TCPA, if the message relates to the reason the number was provided.") (emphasis in the original). The defendant bears the burden of proving that it had such prior express consent, but a specifically tailored, signed document memorializing such consent is not necessary to carrying that burden. *See Latner*, 879 F.3d at 54–55.

*Application*

The remaining question, then, is whether, A.V.M. has met its burden of proof on the issue of whether GMI gave its prior express permission to receive the facsimile advertisements. The Court answers this question by determining whether the advertisements were related to the reason GMI provided its fax number. *Latner*, 879 F.3d at 55.

The 2014 Franchise Agreement, which GMI executed on September 10, 2014, extended an over-twenty-year-old franchise relationship between GMI and its franchisor. GMI was, of course, fully familiar with Wyndham's approved supplier program. The Agreement represented the consummation of a deal that required GMI to review franchise disclosure documents and fill out application forms. GMI had executed both its Franchise Application Form and its Franchise Disclosure Documents on July 22, 2014. The Franchise Disclosure Documents noted that GMI

---

undermined much of the 2003 FCC Order by passage of the JFPA, the Court does not view the 2003 FCC Order as persuasive guidance on this issue, at least insofar as it might be read to create greater obligations than are necessary to satisfy the holding in *Latner*.

would be required to purchase certain goods and services from Wyndham while the Franchise Application Form, like the 2014 Franchise Agreement, contained GMI's fax number.[9] Illustrative of the requirement for GMI to purchase Wyndham-approved goods, the 2014 Franchise Agreement reads in pertinent part:

> **4.4 Purchasing and Other Services.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

In addition to laying out these general requirements, the 2014 Franchise Agreement also specifically incorporates, via Section 3.1, the Property Improvement Plan, which GMI executed on August 26, 2014. The PIP is a document chronicling the improvements that GMI would need to make to maintain its franchise relationship with Wyndham. Among other requirements, the PIP mandated that GMI purchase certain goods to update the hotel's facilities. Failing to make these improvements would have given Wyndham the right to terminate the franchise relationship.[10] The PIP also clearly indicates that Wyndham might provide GMI's contact information to facilitate these improvements, stating:

> By signing this PIP, I acknowledge and agree that select pieces of this PIP may be provided to our approved vendors **for purposes of offering you products and services** that are required to complete this PIP. **Only information necessary for the vendor to offer their products and services will be provided, including contact information,** property address, number of rooms, brand converting

---

[9] A.V.M. does not assert an Established Business Relationship defense, *see* 47 U.S.C. § 227(b)(1)(C)(i), and the Court passes no judgment on whether such defense would be legally valid—nor does the Court need to.

[10] To the extent that the 2014 Franchise Agreement and the 2014 Property Improvement Plan were sealed, the Court will *sua sponte* unseal those documents. See *Brown v. Maxwell*, 929 F.3d 41, 47–48 (2d Cir. 2019) ("It is well-settled that documents submitted to a court for its consideration in a summary judgment motion are—as a matter of law—judicial documents to which a strong presumption of access attaches, under both the common law and the First Amendment."). Any objection to this unsealing should be filed on or before April 5, 2021.

>to, and a list of items related to necessary or required products and services. (Emphasis added.)

In other words, GMI's obligations under the agreements included making improvements to the company's hotels by purchasing certain goods, and GMI provided its fax number to Wyndham as part of those agreements.

The purpose for which GMI provided its fax number is therefore clear: GMI provided this number to facilitate its franchise relationship with Wyndham, which was contingent on GMI's completion of the PIP. Indeed, the goods listed in the PIP were the exact types of goods sold by A.V.M. and advertised in the six faxes at issue. GMI admitted as much in its Local Rule 56(a)(2) statement. Also noteworthy is the fact that five of the six faxes contain a reference to Wyndham. GMI, therefore, received advertisements that were related to the purpose that it provided its fax number to Wyndham. *See Latner*, 879 F.3d at 55.

In short, GMI gave its consent to Wyndham to provide its contact information to vendors that might help GMI meet the requirements in the PIP, and GMI received—as A.V.M. put it in its summary judgment memorandum—"*precisely* the type of communication" to which GMI had consented: fax advertisements about products that would help the company meet the requirements of the PIP. This finding is enough to support granting A.V.M.'s summary judgement motion because neither party contests the validity of the 2014 Franchise Agreement or the PIP. Instead, the parties merely disagree as to the import of those documents on the issues presented here. This Court concludes that these documents demonstrate that GMI provided its express prior invitation or permission to receive fax advertisements.[11]

---

[11] GMI also argues that these documents are an insufficient basis upon which to grant summary judgment because, even if these documents establish prior express invitation or permission to Wyndham, which GMI does not concede, that consent is not transferable to A.V.M., a non-party to either agreement. Under GMI's reading of the law, the sender would be required to get prior express invitation or permission directly from the recipient. *See 2006 FCC Order*, 21 FCC Rcd. at 3811 ("In the absence of an [established business relationship], the sender must obtain the prior express invitation or permission from the consumer before sending the facsimile advertisement."). But GMI's reading of this

Finally, GMI's reliance on *Gorss Motels, Inc. v. Sprint Communications Company* is misplaced. *See* No. 3:17-cv-546 (JAM), 2020 WL 818970 (D. Conn. Feb. 19, 2020). Other than as already discussed above, *Sprint Communications* is easily distinguished on its facts. That case decided only whether Section 4.4 of the 2014 Franchise Agreement demonstrated GMI's express permission regarding the faxes at issue in that case. GMI's PIP was not implicated in the case and of course, as discussed above, is at the very heart of the Court's determination that GMI gave prior express permission to receive faxes from A.V.M. The significance of the PIP to this Court's decision renders this case more akin to *Gorss Motels, Inc. v Otis Elevator Company*, 422 F. Supp. 3d 487 (D. Conn. 2019). There, the court held that the 2014 Franchise Agreement along with the PIP created prior express permission where the vendor at issue advertised a good that GMI was required to improve. *Id.* at 501.[12] This Court agrees that the PIP and 2014 Franchise Agreement are sufficient evidence that GMI consented to receive fax advertisements about products encompassed within the PIP.

Finally, Steven Gorss's testimony that *he* did not consent to receive fax advertisements does not belie the undisputed fact that *Gorss Motels Incorporated* provided its fax number in conjunction with a transaction that (1) required the company to purchase certain goods—of which A.V.M. was a provider—and (2) provided notice that GMI would be contacted by vendors of those certain goods. *See Safemark Systems*, 931 F.3d at 1102 ("testimony about what Steven Gorss

---

passage is overly restrictive. Not only does the FCC mention that consent may "take many forms" in the following sentences, *see id.*, but the statute itself says nothing about the sender receiving that consent directly from the recipient. *See Safemark Systems,* 931 F.3d at 1102 (refusing to read "directly" into 47 U.S.C. § 227(a)(5)). Had Congress or the FCC intended to require such a stringent requirement, either would have written that requirement into the statute or supporting regulations, as appropriate.

[12] The *Otis Elevator* court later indicated, in a different case, that the 2014 Franchise Agreement, along with the franchisor-franchisee relationship between GMI and its franchisor, constituted sufficient prior express permission or invitation to send fax advertisements for goods not included in the PIP. *See Gorss Motels, Inc. v Lands' End, Inc.*, No. 3:19-cv-00010 (VAB), 2020 WL 264784, at *11–*12 (D. Conn. Jan. 16, 2020), *argued on appeal*, No. 20-589 (2d Cir. Dec. 9, 2020). The Court notes that the appeal in *Lands' End* raises many of the issues present in this case, including whether the holding in *Latner* should apply to fax advertisements.

subjectively thought is immaterial because the hotels had already provided their express permission in their franchise agreements"). Per the analysis explained in *Latner*, a fax advertisement received concerning those goods would necessarily be related to the purpose of providing a fax number—namely to make the required purchases. Accordingly, the six faxes at issue were not unsolicited, and A.V.M. did not violate the Telephone Consumer Protection Act of 1991, as amended by the Junk Fax Prevention Act of 2005. *See* 47 U.S.C. § 227(a)(5).

**CONCLUSION**

For the reasons set forth above, A.V.M. has met its burden to show that this case presents no genuine issues of material fact in regard to the prior express invitation or permission defense. *See PepsiCo, Inc*, 315 F.3d at 104–05.[13] A.V.M.'s motion for summary judgment is therefore GRANTED, and GMI's motion for summary judgment is DENIED in all respects. The Clerk of the Court is directed to enter judgment and close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 26th day of March 2021.

                                                                 */s/ Kari A. Dooley*
                                                                 KARI A. DOOLEY
                                                                 UNITED STATES DISTRICT JUDGE

---

[13] Because the Court decides this case on the issue of prior express invitation or permission, the Court need not reach A.V.M.'s collateral estoppel argument.